1

```
 1                     UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2                        FORT LAUDERDALE DIVISION
                        Case No. 10-81041-CIV-WPD
 3
     TARA WHYTE, et al.,              )
 4                                    )
                     Plaintiffs,      )
 5                                    )
                 -v-                  )
 6                                    )
     ALSTON MANAGEMENT, INC.,         )
 7   et al.,                          )
                                      )  Fort Lauderdale, Florida
 8                   Defendants.      )  February 6, 2012
                                      )  9:04 a.m.
 9
                               EXCERPTS
10
                     TRANSCRIPT OF TRIAL PROCEEDINGS
11               (RULE 50 MOTIONS AND JURY QUESTION)

12             BEFORE THE HONORABLE WILLIAM P. DIMITROULEAS

13                         U.S. DISTRICT JUDGE

14   APPEARANCES:

15                             REED COLFAX, ESQ.
                               TARA K. RAMCHANDANI, ESQ.
16                             1255 19th Street NW
                               Suite 600
17                             Washington, D.C. 20036-2456
                                       -and-
18                             JAMES P. CURRY, ESQ.
                               601 Heritage Drive
19                             Suite 205
                               Jupiter, Florida 33458-2777
20                             Appearing on behalf of the Plaintiffs

21   For the Defendants:       GARY F. BAUMANN, ESQ.
                               2866 East Oakland Park Boulevard
22                             Fort Lauderdale, Florida 33306
                               Appearing on behalf of the Defendants
23                             Alston Management, Inc., Big Lake
                               Villages, Inc., Calvin D. Alston,
24                             Mona L. Miller

25
```

2

```
 1   Reported By:          ROBERT A. RYCKOFF
                            Official Court Reporter
 2                          299 East Broward Boulevard
                            Fort Lauderdale, Florida 33301
 3                          954-769-5657

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1        (Call to order of the Court.)

2                        * * * * * *

3        THE COURT:  Rule 50 motions.

4        MR. BAUMANN:  The first motion by the defendants for a

5   directed verdict would be in favor of Mr. Calvin D. Alston

6   individually as a defendant in this case.

7        There has been no showing of any evidence by the

8   plaintiffs in their case in chief either by way of documents or

9   testimony that Mr. Alston in his individual capacity had

10  anything to do with either the notice or the results thereafter

11  of the notice causing or creating the situation that is the

12  basis for this lawsuit.

13       And we would cite in support the U.S. Supreme Court

14  case of Meyer v. Holley, 537 U.S. 280.  It's a 2003 case.  In

15  that case the corporate owners or officers' right to control

16  corporate employees' actions in and of itself is insufficient

17  by itself under traditional agency principles to establish the

18  either principal agent or employer/employee relationship as

19  required to hold the owner individually or officer vicariously

20  liable for employees unlawful acts under the Fair Housing Act (

21  vicariously).

22       Simply put, Your Honor, Mr. Alston intended to lease

23  this property to one tenant in his role as director of Big Lake

24  and president of Alston Management.  At no time did he have

25  direct communication either in writing or verbally with any of

4

1    the plaintiffs in his individual capacity, nor did he ratify

2    after the fact the notice that was sent out by Matthew 25,

3    candidly typed by Ms. Miller and admittedly so, in evidence.

4    That's not in issue here.

5           But absent any special circumstances, it is going to

6    be the corporation, the corporate owner, Alston Management, and

7    the property owner, Big Lake Management, whom the Court has

8    already ruled has a nondelegable duty with regards to

9    discrimination issues, including familial discrimination, not

10   the individual corporate owner in his individual capacity.

11         Typically the corporate employee acts on behalf of the

12   corporation, and in this regard that has been the only

13   testimony that his actions in effectuating a single tenant

14   lease with Matthew 25 was done solely in his corporate

15   capacity, having nothing to do with his individual capacity.

16         And pursuant to the Supreme Court's holding in Meyer

17   v. Holley there has to be some individual action for the Court

18   to hold him individually responsible beyond that of the

19   corporate owner.

20         Thank you.

21         THE COURT:  Let me hear from the plaintiffs.

22         MR. COLFAX:  Your Honor, Mr. Alston can be held liable

23   under three different theories the Fair Housing Act.

24         First is his personal participation in the

25   discrimination alleged and established through the testimony

1    that we have heard from the plaintiffs and the defendants

2    themselves throughout the case.

3           Under the personal participation theory, Mr. Alston

4    was well aware of the conflict between the sex offenders being

5    moved into Pelican Lake Village and having children living and

6    using a school bus stop and a playground at Pelican Lake

7    Village.

8           THE COURT:  Who testified to that?

9           MR. COLFAX:  His awareness -- Mr. Alston testified to

10   his awareness of the conflict between the sex offenders and

11   both the school bus stop, as well as the playground, which he

12   acknowledged that he recognized were both at Pelican Lake

13   Village.  You may remember he --

14          THE COURT:  I thought he said it wasn't even a

15   playground.  It was just some busted equipment.

16          MR. COLFAX:  It may be his interpretation it didn't

17   qualify as a playground, but certainly it was sufficient for

18   the jury to find that there was a playground.

19          Perhaps more significantly he clearly testified he was

20   aware of the conflict with the bus stop, and he talked about

21   the distance that he recognized it would have to be moved from

22   Pelican Lake Village (unintelligible) itself may be sufficient

23   to hold a -- uphold a 3604(b) terms and conditions claim where

24   a bus stop is being moved that far from the property.

25          He instigated by telling -- by directing Mona Miller

6

1    to get the -- ease the transition -- allow the transition from

2    Matthew 25 to be able to come in and occupy the property with

3    the sex offenders and the -- which created the conflict with

4    the families with children.

5          That's sufficient in and of itself for the jury to

6    find that his personal participation makes him liable under the

7    Fair Housing Act.

8          The second basis for his liability is his ratification

9    of Ms. Miller's activities from the perspective that has to be

10   viewed under a Rule 50 motion, which is in the light most

11   favorable to the plaintiffs.  Mr. Alston had no conversation

12   with Mona Miller after discovering she sent out this notice

13   directing the families with children to leave.

14         It's clearly established that a supervisor of an

15   employee who ratifies the employee's conduct can be held liable

16   under the Fair Housing Act under traditional tort principles.

17         Finally, he -- the third alternative is that

18   Mr. Miller is -- excuse me -- Mr. Alston is liable for

19   Ms. Miller's conduct based on a pure (phonetic) vicarious

20   liability agency concept.

21         And stepping away from the fact that Mr. Alston is the

22   sole owner of Big Lake Villages and Alston Management,

23   Mr. Alston was indisputably Ms. Miller's supervisor, and under

24   traditional agency principles, which Meyer versus Holley as

25   cited by the defendants say apply under the Fair Housing Act a

7

```
 1    principal is liable for the acts of his or her agent if the
 2    principal has the power to control the agent and both the
 3    principal and the agent have consented to that relationship.
 4             There is undisputed -- and, in fact, plaintiffs
 5    move -- we move ourselves on Rule 50 to find that -- for the
 6    Court to find that Mr. Alston is liable as a matter of law
 7    under this theory because both Mr. Alston and Ms. Miller took
 8    the stand and stated, yes, Mr. Alston controlled her acts.
 9    They both recognized it, consented to it.  She had worked under
10    Mr. Alston for many, many years, at least seven years while
11    Alston management was managing Pelican Lake.  It's clear that
12    that relationship had manifested itself as a clear agency
13    relationship.
14             And so under those principles of agency relationship,
15    Mr. Alston at a minimum should be held liable for the acts of
16    Ms. Miller.
17             THE COURT:  Anything further, Mr. Baumann?
18             MR. BAUMANN:  Yes, briefly, Your Honor.
19             The Supreme Court in Meyer v. Holley addressed that
20    specific issue -- if I could go in reverse order from
21    plaintiffs' argument under the agency principle, agency
22    theory -- and specifically held that the right to control is
23    insufficient by itself under traditional agency principles to
24    establish a principal agent or employer/employee relationship.
25             Meyer versus Holley also talks about traditional tort
```

8

```
 1   principles being available as damages under the Fair Housing
 2   Act.  That's indisputable.
 3          But what it also says is that it would be the
 4   corporate employer -- in this scenario, Alston Management --
 5   who the Court has already ruled is responsible for a majority
 6   of the claims -- who is the corporate employer for Ms.
 7   Miller and her conduct under the theory of vicarious liability
 8   Blake.
 9          Big Lake Village, the corporate owner of the property,
10   the Court having found they have a nondelegable duty.
11          There has to be some showing of -- going back to
12   number two -- there was -- agency doesn't apply under Meyer.
13          Number two, ratification requires some evidence by
14   Mr. Alston that he approved, endorsed, ratified what had
15   happened with the notice and the impact on the families.
16          The evidence is exactly to the contrary where he was
17   offended.  He confronted Matthew 25, who assured him they had
18   spoken personally with every one of the residents and had told
19   them that did not have to move.  Okay.
20          That does not demonstrate ratification.
21          And last -- going back to the first one -- personal
22   conduct, the decision in his corporate capacity to rent to one
23   tenant who happens to minister to ex-offenders, including sex
24   offenders, that is not in and of itself sufficient to hold him
25   liable personally.
```

9

 1          The Court can make rulings about how the owner of the

 2    property, Big Lake, is impacted, and what liability they may

 3    have, but not Dale Alston individually and personally.  There

 4    is simply just no evidence here of his involvement on a

 5    personal level.

 6          THE COURT:  Any more Rule 50 motions?

 7          MR. BAUMANN:  Yes, sir.

 8          The defendants would also move for Rule 50 motions on

 9    the remaining claims of plaintiffs Ms. Chery, Mr. Eccleston,

10    and Mack.  We do not believe that the evidence is sufficient

11    for a finding -- a direct Rule 50 motion against us, which we

12    anticipate.  We think we are entitled to a Rule 50 motion for

13    reasons that we have set forth in our initial response to the

14    motion for summary judgment.  I will stand on those arguments.

15          THE COURT:  The plaintiffs Rule 50 motions.

16          MR. COLFAX:  Do you want a response to that last Rule

17    50 motion related to Mack, Eccleston and Chery, Your Honor?

18          THE COURT:  You can if you want.

19          MR. COLFAX:  I will just note for the Court that Mr.

20    Eccleston and Ms. Mack testified they had conversations with

21    Mona Miller regarding being forced out of Pelican Lake, and she

22    confirmed that they had to leave.

23          And Mr. Eccleston also testified that he saw the

24    notice, which, of course, was directed to all families with

25    children, which applied to him while he was at Pelican Lake.

1          Ms. Chery also had a conversation with Ms. Miller that

2     she testified about regarding having to move from Pelican Lake

3     because she had children and discussing alternative housing.

4          THE COURT:  I thought Mr. Eccleston said he never

5     received a notice.

6          MR. COLFAX:  Mr. Eccleston said he never received the

7     notice, but then also testified that he had seen it from one of

8     the neighbors.  In addition, of course, to having a

9     conversation with Ms. Miller.  You may recall that

10    Mr. Eccleston called Ms. Miller and Ms. Mack was standing as

11    Mr. Eccleston had that conversation with Ms. Miller, and he

12    specifically asked her whether he had to leave because he had a

13    family with children, and Ms. Miller confirmed it, and then

14    began offering him alternative housing.

15         In terms of plaintiffs' Rule 50 motions, as I stated,

16    plaintiffs move for the liability of Calvin Alston for the acts

17    of Mona Miller, and it is actually based on the Meyer versus

18    Holley case which Mr. Baumann incompletely describes for the

19    Court.  It does not eliminate agency liability in this

20    circumstance.  Instead it says that there are three

21    requirements that have to be met, the power to control, the

22    manifestation of consent from both sides to the relationship,

23    from the principal and the agent, and then vicarious liability

24    is established.

25         There is not a shred of evidence that Mr. Alston

1   lacked the power to control Ms. Miller.  There is not a shred

2   of evidence that either side did not consent to that

3   relationship.

4           Under Meyer v. Holley then and the traditional agency

5   principles it says applies under the Fair Housing Act.

6   Defendant Alston is responsible for the acts -- in his personal

7   capacity -- is responsible for the acts of Ms. Miller.

8           Secondarily, plaintiffs move for a finding that Big

9   Lake Villages is responsible under the nondelegable duty

10  doctrine for the acts of Matthew 25, which was functioning as

11  the managing agent at Pelican Lake Village at whatever time

12  Alston Management ended its management there.  There is no

13  factual distinction between what Alston Management did at

14  Pelican Lake Village and what Matthew 25 did at Pelican Lake

15  Village.  When they switched, Big Lake Villages, of course,

16  owned the property continuously during the whole time.

17          And so the Court's finding of the application of

18  nondelegable duty doctrine applied to Alston Management applies

19  with equal force to the acts of Matthew 25.

20          THE COURT:  All right.  I think all those issues are

21  questions of fact for the jury.  It's circumstantial evidence

22  that the jury may decide to credit.  And I am going to deny the

23  Rule 50 motions.

24          Let's make a five-minute recess for the court reporter

25  and then we will do a charge conference.

```
 1          MR. BAUMANN:  Your Honor, there is one other motion I
 2   wanted -- I wasn't finished on the Rule 50.  The defendants --
 3   and I apologize for not indicating -- but the defendants
 4   move -- and when I say, "defendants," all four of the clients I
 5   represent, Dade Alston individually, Big Lake, Inc., Alston
 6   Management, Inc., and Mona Miller individually, move the Court
 7   under Rule 50 for a directed verdict of the issue of punitive
 8   damages.
 9          As the Court knows, punitive damages are reserved for
10   the worst of the worst cases.  There is an opportunity for the
11   plaintiffs to plead punitive damages in their initial
12   Complaint, but must demonstrate through the evidence some
13   reckless disregard or willful and wanton reckless disregard by
14   the -- one or more of the defendants.
15          And citing to the case of Matarese v. Archstone
16   Pentagon City.  It is 795 F.Supp.2d 402.  It is a 2011 case.
17   The Court states that while punitive damages may be awarded in
18   a civil rights case where the defendant's conduct is shown to
19   be motivated by evil motive or intent or when it involves
20   reckless or callous indifference to the federally protected
21   rights of others.
22          The issue, of course, is the Fair Housing Act, and
23   that's the federal protected rights of all the plaintiffs, and
24   thus the opportunity to plead punitive damages, but there still
25   must be a showing of willfulness, wanton reckless disregard by
```

13

1    the defendants in order to have the opportunity to make that

2    request of the jury at the end of the case.

3          Not one of the plaintiffs or their witnesses that they

4    called in this case felt that the defendants had acted with a

5    history of discrimination or episodes of prior discrimination

6    over the twenty plus years that Alston Management managed the

7    property.  Nobody said that the defendants should be punished

8    for their conduct.

9          The only evidence submitted to the jury were requests

10   for compensation of expenses of various natures, including the

11   opportunity for mental anguish in one form or another.

12         There are no hostile facts prior or subsequent.  In

13   fact, there is evidence that the parties seem to still get

14   along with Ms. Miller in her role at Alston Management after

15   the fact.

16         And there is no automatic right of entitlement to seek

17   punitive damages after the evidence has been put on and after

18   plaintiff has closed the case.  Only the Court can permit that

19   subject to this Rule 50 motion.  It is the Court's role, of

20   course, as gatekeeper that I speak of with respect to the

21   punitive damage issue.

22         So the absence of any maliciousness by these

23   defendants -- and I would cite to the Court the testimony and

24   evidence whereby Matthew 25 had, quote, unquote, a plan.

25         My client had no knowledge of the plan, Mr. Alston

1    testified to.  The first he heard of a plan was in the context

2    of this trial.  They never endorsed it.  They never ratified

3    it.  It was never discussed as part of the lease agreement

4    negotiations, which lasted several months, and contained

5    several conditions which have been addressed in this trial.

6           Therefore the defendants whom I previously referenced

7    move the Court for a directed verdict on the issue of punitive

8    damages.

9           THE COURT:  I think it's a question of credibility for

10   the jury.  If the jury believes Mr. Alston, they shouldn't

11   return any punitive damages.  If they don't, there is

12   sufficient evidence there that would justify it.  So I will

13   deny the Rule 50 motion on punitive damages.

14          We will take a five-minute recess for the court

15   reporter.

16      (Recess taken at 9:54 a.m. until 10:02 a.m.)

17                        * * * * *

18      (4:36 p.m.)

19          THE COURT:  All right.  We are back on the record.

20   Counsel are present.

21          We have a note from the jury.

22          Question:  What is the legal definition of "reckless

23   indifference"?

24          Signed by Virginia Chanian.

25          What's counsel's position on that?

15

1          MR. COLFAX:  Your Honor, I anticipate that there is an

2    Eleventh Circuit pattern instruction defining "reckless

3    indifference."  I would suggest that we just provide that to

4    the jury.

5          THE COURT:  Let's see if we can find it.

6          2.1 is the supplemental damages instruction on

7    punitive damages, but I don't see that it

8    defines "reckless indifference."

9          I mean there is an Eleventh Circuit case

10   saying "malice" means an intent to harm and "recklessness"

11   means serious disregard for the consequences of one's actions.

12         Any suggestions?

13         MR. COLFAX:  If that's the standard law in the

14   Eleventh Circuit, Your Honor, I would be fine with that.  I

15   don't know offhand exactly how it's defined in the Eleventh

16   Circuit.  I probably couldn't find it for a little bit.  I

17   would have to get to my computer.

18         MR. BAUMANN:  The defendants would object to a

19   definition being offered to the jury at this time that was not

20   part of the jury instructions.

21         I think the Court can instruct the jury that the

22   word -- the plain meaning of the words "reckless indifference"

23   can be interpreted by the jury.

24         THE COURT:  That's one thing we can do, but they

25   wouldn't be asking the question if they could interpret the

16

1   meaning of it probably.

2           MR. BAUMANN:  Unless they are looking for the legal

3   standard thinking that all legal standards have significance.

4           MR. COLFAX:  This is clearly a phrase that is defined

5   in the law.  I think if we find that definition as it applies

6   here, then we should provide it to the jury.

7           THE COURT:  There is a Tenth Circuit ADA case saying

8   the plaintiff may seek punitive damages if his employer acted

9   with malice or with reckless indifference to the plaintiff's

10  federally protected rights.  And the Tenth Circuit has said to

11  satisfy this standard the employer must engage in prohibited

12  conduct with knowledge that it may be acting in violation of

13  federal law, not merely awareness that it is engaging in

14  discrimination.

15          So it's almost a subjective finding that the

16  individual is -- knows that he is violating federal law.

17          Do you like that one better, Mr. Baumann?

18          MR. BAUMANN:  I could live with that one.

19          MR. COLFAX:  That one sounds to me, Your Honor, like

20  one that was specific to those -- the facts that were before

21  that particular Court.  Reckless indifference obviously applies

22  in a number of different consequences, in a number of

23  different -- not consequences -- circumstances -- and it

24  certainly has a more generic meaning that I would anticipate

25  has been defined in the Eleventh Circuit.

1          MR. BAUMANN:  The only part that I thought was helpful

2     was that it applied to a federally protected right as part of

3     the definition and I think that's important for this case.

4          THE COURT:  I mean the instruction we gave them says

5     if they find a defendant acted with malice or reckless

6     indifference to a plaintiff's rights under the Federal Housing

7     Act.

8          So I think that's part of this instruction that has to

9     be reckless indifference to federally protected rights.

10          MR. COLFAX:  I think that's certainly accurate, Your

11     Honor.  I just -- there is more ways of establishing reckless

12     indifference than showing a knowledge -- showing the

13     defendant's knowledge that he or she was violating those

14     rights.  And the first standard you read from the Eleventh

15     Circuit, serious disregard for the consequences of one's

16     action, certainly encompasses that concept, knowingly violating

17     someone's federally protect rights, as well as other

18     circumstances that are sufficient to allow for punitive

19     damages.

20          MR. BAUMANN:  As I appreciate definitions in general

21     as pertaining to case law, they usually establish a floor in

22     the definition, and while there may be other reasons above the

23     floor, if the case law discusses the floor as it pertains to

24     federally protected rights, and what that floor would be

25     relating to knowledge, then that's the floor.

18

```
1            THE COURT:  Let me go grab the volume that this
2   Eleventh Circuit case is in and see if looking at the case in
3   its context will help.
4            ( Off the record discussion.)
5            THE COURT:  The case I am looking at is Miller versus
6   Kenworth Of Dothan, Inc. at 277 F.3d 1269, Eleventh Circuit
7   opinion case from 2002.  I that it's a 1981 case.  And in that
8   case the Eleventh Circuit says:  The Supreme Court has directed
9   that, for the issue of punitive damages to reach the jury in a
10  section 1981 case, the plaintiff must come forward with
11  substantial evidence that the employer acted with actual malice
12  or reckless indifference to his federal protected rights.
13  Citing a U.S. Supreme Court case.  Malice or reckless
14  indifference is established by a showing that the employer
15  discriminated in the face of the knowledge that its actions
16  would violate federal law.  Again citing Kolstad versus
17  American Dental Association at 527 U.S. 526, a 1999 Supreme
18  Court case.  We have held that punitive damages will ordinarily
19  not be assessed against employers with only constructive
20  knowledge of harassment; rather, punitive damages may only be
21  considered in cases where the discriminating employee was high
22  up the corporate hierarchy or where higher management
23  countenanced or approved behavior.
24           MR. BAUMANN:  I think the second part of that was in
25  the instruction already.
```

19

1            THE COURT:  It was.

2            Finally, the Supreme Court has held that employers may

3    assert a good faith defense to vicarious liability for punitive

4    damages where the employment decisions of managerial agents are

5    contrary to the employer's good-faith efforts to comply with

6    Title VII.

7            We don't have any Farragher company policies or

8    anything like that that was promulgated in this case.

9            I mean I can read them this part of the opinion

10   saying, "Malice or reckless indifference is established by a

11   showing that the employer discriminated in the face of the

12   knowledge that its actions would violate federal law."

13           Or we can change the word "employer."

14           MR. BAUMANN: "Defendant" instead of "employer"?

15           MR. COLFAX:  I would be fine with certainly

16   substituting "defendant" as -- instead of "employer."  I just

17   don't want the language to suggest that's the sole way you

18   could find reckless indifference.  Again, in this case, it is a

19   good example, and that would -- it will assist the jury.  Just

20   so it doesn't -- it isn't read as being the exclusive way of

21   finding reckless indifference.

22           MR. BAUMANN:  I think the jury --

23           THE COURT:  I mean I can bring them out.  I can read

24   their question.  And then I can just read what I just

25   read, malice or reckless indifference is established by a

1   showing that the defendant discriminated in the face of the

2   knowledge that its actions would violate federal law, and then

3   send them back in.

4          MR. COLFAX:  I would simply request that you

5   replace "is" with "can be."

6          MR. BAUMANN:  I would object to that.

7          THE COURT:  It may not be answering their question,

8   but I think it's a correct statement of the law.

9          MR. BAUMANN:  I think the other mechanisms for

10  punitive damages is not being called into question by the jury.

11  They have those instructions that the Court read and agreed

12  that were already provided to them.  I think the only issue

13  that -- is not whether other mechanisms exist, but --

14         THE COURT:  What other way could they find punitive

15  damages in this case other than malice or reckless

16  indifference?

17         MR. BAUMANN:  The next provision I believe that you

18  read discussed whether it was somebody who was so high up, a

19  managing agent type theory, that plaintiffs submitted in their

20  jury instruction request that was read to this jury.

21         THE COURT:  Here is a Southern District case -- which

22  is obviously only persuasive on me -- from Judge Altonaga --

23  who is smarter than me -- at 334 Federal Supp.2d 1303, a 2004

24  opinion.  Although I don't know that she was smarter than me

25  back then.  She was brand new to the bench then.  And it says,

21

1   among other things:  At a minimum in order to be liable for

2   punitive damages an employer must at least discriminate in the

3   face of a perceived risk that its actions will violate federal

4   law.

5          MR. BAUMANN:  I think that that is the same or close

6   to the same definition, which is present.

7          The definition that the Court read from the Eleventh I

8   think would be appropriate, replacing "employer"

9   for "defendant."

10          THE COURT:  All right.  I am going to read that

11   instruction from Miller versus Kenworth Of Dothan

12   substituting "can be" for "is" and substituting "defendant"

13   for "employer."

14          Anything further before we bring the bring the jury

15   in?

16          MR. COLFAX:  Nothing further.

17          MR. BAUMANN:  Nothing further.

18          Just noting my objection.  That's all.

19          THE COURT:  Okay.

20          (Jury in at 4:55 p.m.)

21          THE COURT:  All right.  We have all the jury back.

22          I have got a note from you:  What is the legal

23   definition of "reckless indifference"?

24          Okay.  I am going to read something to you now.

25          Malice or reckless indifference can be established by

22

1    a showing that the defendant discriminated in the face of the

2    knowledge that its actions would violate federal law.

3             Do you need me to repeat that, anybody?

4             Malice or reckless indifference can be established by

5    a showing that the defendant discriminated in the face of the

6    knowledge that its actions would violate federal law.

7             And with that I will ask that you retire and continue

8    your deliberations.

9             (Jury out at 4:57 p.m.)

10            THE COURT:  Any objection to the manner in which the

11   Court read the instruction?

12            MR. BAUMANN:  No objection to the manner, sir.

13            MR. COLFAX:  No objection.

14            THE COURT:  Let's wait about ten minutes.  If we

15   haven't heard from them, then I will bring them out and see if

16   they want to continue to deliberate.  So we will be in recess

17   until we hear we further from the jury or ten minutes more,

18   whatever comes first.

19            (Recess taken at 4:58 p.m.)

20                        * * * * *

21

22

23

24

25

23

1

2

3                    REPORTER'S CERTIFICATION

4

5       I hereby certify that the foregoing is a true and accurate

6   transcript of the proceedings recorded by me and reduced to

7   typewriting at my direction.

8

9

10                              Court Reporter

11                              Robert Ryckoff

12                              /S/ Robert Ryckoff

13

14                              Date:  2-14-12

15

16

17

18

19

20

21

22

23

24

25